[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 14, 2010
JOHN LEY
CLERK

_____

No. 09-10609

_____

D. C. Docket No. 08-00090-CR-ORL-28DAB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JONATHAN DAVID GHERTLER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 14, 2010)

Before DUBINA, Chief Judge, MARTIN and HILL, Circuit Judges.

MARTIN, Circuit Judge:

Jonathan David Ghertler appeals his concurrent 185-month sentences

imposed after he pleaded guilty to eight counts of wire fraud. He argues that the

district court procedurally erred by failing to explain adequately the reasons for his sentence; that his sentence was improperly enhanced for abusing a position of trust and the use of sophisticated means; that his sentence is unconstitutional because the district court relied on facts that were neither admitted in his guilty plea nor proved to a jury beyond a reasonable doubt; and that the district court erroneously considered unreliable information at sentencing. After thorough review and oral argument, we reverse the district court's application of a two-level enhancement under United States Sentencing Guidelines § 3B1.1 for abuse of a position of trust. We affirm Mr. Ghertler's sentence in all other respects.

## I.

Between July 2006 and December 2007, and while on supervised release from another fraud conviction in the Southern District of New York, Mr. Ghertler perpetrated a series of remarkably successful frauds on large corporations and law firms. Mr. Ghertler would first research companies and the names of their officers on the internet. He would then telephone the company, identify himself as a high-ranking company official (many times, though not always, the general counsel), and claim that he needed an immediate cash transfer to resolve an urgent matter (usually, the settlement of a fictitious lawsuit). He would then either give verbal instructions regarding the distribution of funds, or fax letters or memoranda over a

2

forged signature authorizing the transfers and providing instructions. At times, the funds were transferred directly to Mr. Ghertler. On other occasions Mr. Ghertler used unwitting couriers to pick up and deliver the proceeds of the frauds. Sometimes he had the funds wired into the accounts of unwitting third parties, who then transferred the cash proceeds to him.

On April 16, 2008, Mr. Ghertler was indicted on eight counts of wire fraud under 18 U.S.C. § 1343. The indictment alleged that Mr. Ghertler defrauded a total of fourteen different companies, though only seven were named.[1] The indictment alleged a total intended loss amount of $956,500, but sought forfeiture of $766,500, which the indictment alleged as the actual loss amount.

On July 23, 2008, three days before Mr. Ghertler was to go to trial, the United States superseded the indictment, deleting any reference to the previously unnamed companies and reducing the forfeiture amount to $250,000.[2] Mr. Ghertler then entered a guilty plea to Counts One through Eight of the superseding indictment. He had no plea agreement with the government but admitted that he defrauded the seven companies identified in the indictment. He stated that had the United States not superseded the indictment to remove the reference to the

_____

[1] The indictment identified (1) Alcoa, Inc., (2) Allstate Insurance Co., (3) Bristol-Myers Squibb, (4) Lockheed Martin Corp., (5) Science Applications International Corp., (6) Winston & Strawn, LLP, and (7) Wyeth Pharmaceuticals as victims of Mr. Ghertler's fraudulent scheme.

[2] The superseding indictment was otherwise identical to the original indictment.

3

unnamed companies, he would have gone to trial. For its part, the United States made clear that it intended to offer proof at sentencing of the seven additional frauds alleged in the original indictment.

Through the presentence investigation, the U.S. Probation Office found that Mr. Ghertler had defrauded fourteen different companies. These included the seven companies named in the superseding indictment, as well as Ropes & Gray, LLP, Howrey & Simon, LLP ("Howrey"), J.P. Morgan Trust Co., Wachovia Bank ("Wachovia"), Bank of New York Mellon ("Bank of New York"), National City Bank, and HSBC Bank ("HSBC"). The presentence investigation report ("PSR") calculated the guidelines as follows: a base offense level of 7; a 16-level increase because the intended loss was greater than $1 million but not more than $2.5 million; a two-level increase because the offense involved more than ten victims; a two-level increase because Mr. Ghertler relocated the fraud to another jurisdiction to evade law enforcement or used sophisticated means; a two-level increase for abuse of a position of trust; and a two-level increase for obstruction, for a total offense level of 31. Based on Mr. Ghertler's extensive criminal history, which placed him in Criminal History Category VI,[3] Mr. Ghertler's Guidelines range was

---

[3] Mr. Ghertler's criminal history includes numerous theft, burglary, and fraud convictions, including two fraud convictions based on schemes that are essentially identical to the charged conduct.

188 to 235 months.

Mr. Ghertler objected to the PSR, denying responsibility for the seven unindicted frauds. He argued that it is unconstitutional to sentence him more harshly based on conduct neither admitted by him nor submitted to a jury. He objected to the loss calculations and the number of victims for the same reason. He also objected to the obstruction, abuse-of-trust, and sophisticated means enhancements.

The district court then held a five-day sentencing hearing. The United States presented testimony from the investigating and arresting agents, officials from the defrauded companies, and three couriers who were unwitting participants in the frauds. Mr. Ghertler also took the stand to testify regarding a confession he gave to the arresting agents and his involvement in the various frauds.

After hearing the evidence and argument, the district court overruled Mr. Ghertler's objections to the unindicted conduct and found that Mr. Ghertler committed each of the frauds identified in the PSR. The district court also made the following guideline applications: that there were more than ten victims; that Mr. Ghertler either relocated the fraud to evade law enforcement or used sophisticated means; that a two-level enhancement for obstruction was warranted; and that Mr. Ghertler was not entitled to credit for acceptance of responsibility.

Among the issues before us is the district court's finding that Mr. Ghertler abused a position of trust based on his impersonation of high-level company officials. Finally, the district court accepted the government's position that, in fact, the intended loss was between $400,000 and $1 million. With these changes, the court specifically adopted the PSR as the findings of the court. Based on Mr. Ghertler's Criminal History Category of VI, and a total offense level of 29, the district court determined that Mr. Ghertler's Guidelines range was 151 to 188 months imprisonment, his restitution amount was $766,500, and he faced a potential fine of $15,000 to $1,533,000.

After hearing argument from the parties regarding the appropriate sentence and Mr. Ghertler's allocution, the district court sentenced Mr. Ghertler to 185 months in prison. He also imposed a three year term of supervised release, waived the fine, and mandated restitution. This appeal followed.

## II.

Mr. Ghertler argues that his sentence is procedurally unreasonable because the district court did not offer an adequate explanation for the sentence it imposed as required by 18 U.S.C. § 3553(c)(1). In this respect, Mr. Ghertler urges us not to consider statements made by the district court relating to, among other things, his extensive criminal history and his admission that he could not stop offending.

6

Setting these statements aside, Mr. Ghertler argues that the only explanation the district court gave for his sentence was that "the sentence imposed [was] sufficient but not greater than necessary to comply with the satisfactory purposes of sentencing." Mr. Ghertler characterizes this as a "truism" that provides an inadequate basis for appellate review.

We review *de novo* the sufficiency of the district court's explanation under § 3553(c)(1). United States v. Bonilla, 463 F.3d 1176, 1181 (11th Cir. 2006).

"Pursuant to 18 U.S.C. § 3553(c)(1), a district court is required to state, in open court, the reason for its particular sentence, and if the sentence 'is of the kind, and within the range [recommended by the Guidelines] and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range.'" Bonilla, 463 F.3d at 1181 (quoting 18 U.S.C. § 3553(c)(1)) (alteration in original). This explanation is "important" and "reflects sound judicial practice" because "[c]onfidence in a judge's use of reason underlies the public's trust in the judicial institution" and a statement of the judge's reasoning "helps provide the public with the assurance that creates that trust." Rita v. United States, 551 U.S. 338, 356, 127 S. Ct. 2456, 2468 (2007).

The length and amount of detail describing the district court's reasoning depends on the circumstances. Id. A sentencing court is not required to "'incant

the specific language used in the guidelines'" or "articulate its consideration of each individual § 3553(a) factor," so long as the record reflects the court's consideration of many of those factors. Bonilla, 463 F.3d at 1182 (quoting United States v. Parrado, 911 F.2d 1567, 1572 (11th Cir. 1990)). It is sufficient for the district judge to "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." Rita, 551 U.S. at 356, 127 S. Ct. at 2468. "Simply stated, a sentencing court should be mindful of the 'factors to be considered in imposing a sentence' when explaining its reasons for imposing a particular sentence and should tailor its statement accordingly." Parrado, 911 F.2d at 1573.

Here, the district court listened to the parties' arguments regarding the appropriate sentence within the Guidelines range and heard from Mr. Ghertler, who admitted his significant criminal history but expressed a desire to change his ways. The district court then imposed a sentence that clearly reflected consideration of the § 3553(a) factors. The court expressly referred to Mr. Ghertler's significant criminal history; the fact that Mr. Ghertler had continued to make fraudulent calls while incarcerated; the fact that Mr. Ghertler admitted that he was impulsive and that he "could not stop" offending; and the fact that Mr.

8

Ghertler had skills and talents that could have been put to productive use. These statements demonstrate the district court's consideration of the nature and circumstances of the offenses; Mr. Ghertler's significant criminal history; whether he is likely to offend again; and the need to protect the public from further crimes by the defendant. This explanation is sufficient for purposes of § 3553(c)(1).

We reject Mr. Ghertler's arguments to the contrary. First, Mr. Ghertler is wrong that we should not consider the district court's statements described above because they were made after the sentence was imposed and did not relate to the sentence selected. The record shows that, although the district court's comments followed the imposition of the sentence, those comments were clearly part of the court's closing remarks regarding the propriety of the sentence. We have taken a holistic approach in evaluating the district court's explanation of the sentence imposed. Our review is not limited to the district court's closing remarks. See Parrado, 911 F.2d at 1573 (holding that district court adequately explained its reasons for imposing life sentence based on review of the transcript of the sentencing hearing "taken together with the court's closing remarks"); see also id. (citing with approval United States v. Wivell, 893 F.2d 156, 158 (8th Cir. 1990) (record of entire sentencing hearing considered in evaluating district court's reasons for imposing particular sentence)). Within this framework, we cannot

9

credit Mr. Ghertler's contention that we should not consider the district court's explanation.

Neither do we accept Mr. Ghertler's argument that the district court's explanation was nothing more than a "truism" that provides an insufficient basis for appellate review. To support this argument, Mr. Ghertler relies on our decision in United States v. Veteto, 920 F.2d 823 (11th Cir. 1991). In Veteto, the district court made no reference to the § 3553(a) factors; did not discuss the specifics of the defendant's history, crimes, or situation; and offered no explanation for the 200-month sentence it imposed except to say that it "seemed right."[4] Id. at 826–27 (alteration omitted). In contrast to Veteto, the district court in this case expressly recognized its obligation to consider the § 3553(a) factors and discussed specific characteristics of the defendant including, among other things, his extensive criminal history and admitted inability to refrain from offending. The district court's explanation in this case goes far beyond the mere "truism" in Veteto and satisfies the requirements of § 3553(c)(1).

---

[4] In reversing for failure to comply with § 3553(c)(1), we explained in Veteto that "all sentences should seem 'right' to the sentencing judge." 920 F.2d at 826. Therefore, "a judge's view that a given sentence is appropriate, without more detail, is a truism and not an explanation." Id. Because the district court failed to make any reference to the § 3553(a) factors or to the specifics of the defendant's history, crimes, or situation, we vacated the sentence and remanded for additional explanation. Id. at 827.

10

**III.**

The district court applied a two-level enhancement under U.S.S.G. § 3B1.3 because it found that Mr. Ghertler abused a position of trust. In applying this enhancement, the district court recognized that Mr. Ghertler did not actually hold a position of trust and also that none of the victim corporations reposed any trust in him. The district court found that the enhancement should apply, however, based on Mr. Ghertler's impersonation of company officials who themselves occupied positions of trust. The district court based its decision to apply the enhancement on Application Note 3 to § 3B1.3, which provides:

> This adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not. For example, the adjustment applies in the case of a defendant who (A) perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker; or (B) perpetrates a fraud by representing falsely to a patient or employer that the defendant is a licensed physician. In making the misrepresentation, the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately.

U.S.S.G. § 3B1.3 cmt. n.3.

Mr. Ghertler highlights the district court's findings that he did not abuse any discretionary authority entrusted to him by the victims. He argues that the district

11

court was confused by, and misapplied, Application Note 3. He urges that Note 3 was intended to apply to imposters who fraudulently entice their victims to enter relationships of trust (for example, by falsely claiming to be an investment broker) and then abuse the discretionary authority their victims have conferred upon them. We agree.

We review *de novo* the district court's conclusion that the defendant's conduct justifies the abuse-of-trust enhancement. United States v. Garrison, 133 F.3d 831, 837 (11th Cir. 1998).

The Guidelines provide for a two-level enhancement if the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3; United States v. Walker, 490 F.3d 1282, 1300 (11th Cir. 2007). "The determination of whether a defendant occupied a position of trust is extremely fact sensitive." United States v. Louis, 559 F.3d 1220, 1225 (11th Cir. 2009) (quotation omitted). In the fraud context, "we have explained that § 3B1.3 applies . . . where the defendant is in a fiduciary, or other personal trust, relationship to the victim of the fraud, and the defendant takes advantage of the relationship to perpetrate or conceal the offense." United States v. Williams, 527 F.3d 1235, 1250 (11th Cir. 2008) (quotations omitted). We have cautioned that "'there is a

12

component of misplaced trust inherent in the concept of fraud,'" Garrison, 133 F.3d at 838 (quoting United States v. Mullens, 65 F.3d 1560, 1567 (11th Cir. 1995)), and that a "sentencing court must be careful not to be 'overly broad' in imposing the enhancement for abuse of a position of trust or 'the sentence of virtually every defendant who occupied any position of trust with anyone, victim or otherwise' would receive a section 3B1.3 enhancement," id. (quoting United States v. Moored, 997 F.2d 139, 145 (6th Cir. 1993)). "Thus, for the abuse-of-trust adjustment to apply in the fraud context, there must be a showing that the victim placed a special trust in the defendant beyond ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario." Williams, 527 F.3d at 1250–51.

A relationship of trust between the defendant and the victim is the *sine qua non* of the abuse-of-trust enhancement. See Garrison, 133 F.3d at 839 ("[T]he abuse of trust enhancement applies only where the *defendant has abused discretionary authority entrusted to the defendant by the victim*." (emphasis in original)); see also Williams, 527 F.3d at 1250–52 (explaining that courts evaluate abuse-of-trust enhancement "by assessing the defendant's relationship to the victim of the crime" and reversing enhancement where "there is no evidence that [the victim] entrusted [the defendant] with discretionary authority or placed a special

13

trust, akin to that of a fiduciary, in [the defendant]"); United States v. Morris, 286 F.3d 1291, 1295–1300 (11th Cir. 2002) (reversing application of enhancement where attorney participated in conspiracy to launder money but intended victims were not his clients); United States v. Mills, 138 F.3d 928, 941 (11th Cir. 1998) (reversing enhancement because Medicare-funded care provider does not occupy position of trust vis-a-vis Medicare).

In this case, the district court found and the United States concedes, Mr. Ghertler did not occupy a position of trust with respect to the victims of his frauds. That Mr. Ghertler perpetrated those frauds by impersonating high-level company officials does not change that fact. Because there was no relationship of trust between Mr. Ghertler and the victims for him to abuse, he is not eligible for this enhancement.

Application Note 3, which the district court relied upon, does not alter this conclusion. Application Note 3 was added to § 3B1.3 at a time when the circuits were split on the question of whether to enhance defendants who entice their victims to enter into relationships of trust by misrepresenting their qualifications. The Second Circuit had held in United States v. Echevarria that § 3B1.3 applied only "to those who *legitimately* occupy positions of public or private trust," 33 F.3d 175, 181 (2d Cir. 1994) (emphasis in original), and that it did not apply to a

14

defendant who "fraudulently held himself out as a physician for several years" and "misrepresented himself as a doctor by, *inter alia*, advertising in telephone directories as a physician, displaying false academic credentials, and setting up a medical office," id. at 177, 181. The First and Tenth Circuits had reached the opposite conclusion. Those courts held that the enhancement also applied to "imposters" who falsely held themselves out to occupy positions of trust and entered into relationships with their victims based on those misrepresentations. See United States v. Gill, 99 F.3d 484, 488–89 (1st Cir. 1996); United States v. Queen, 4 F.3d 925, 927–30 (10th Cir. 1993). Through Application Note 3, the Commission intended to adopt the view of the First and Tenth Circuits and specifically rejected the Second Circuit's decision in Echevarria. The historical notes to § 3B1.3 explain:

> The purpose of [Application Note 3] is to establish that the two-level increase for abuse of a position of trust applies to a defendant who is an imposter, as well as to a person who legitimately holds and abuses a position of trust. This amendment resolves a circuit conflict on that issue. Compare United States v. Gill, 99 F.3d 484 (1st Cir. 1996) (adjustment applied to defendant who posed as licensed psychologist), and United States v. Queen, 4 F.3d 925 (10th Cir. 1993) (adjustment applied to defendant who posed as financial broker), cert. denied, 510 U.S. 1182 (1994), with United States v. Echevarria, 33 F.3d 175 (2d Cir. 1994) (defendant who poses as physician does not occupy a position of trust). The amendment adopts the majority appellate view and provides that the abuse of position of trust adjustment applies to an imposter who pretends to hold a position of trust when in fact he

15

does not. The Commission has determined that, particularly from the perspective of the crime victim, an imposter who falsely assumes and takes advantage of a position of trust is as culpable and deserving of increased punishment as is a defendant who abuses an actual position of trust.

U.S.S.G. § 3B1.3, Historical Notes, 1998 amend.

The application note therefore clarifies that a defendant who entices a victim to grant the defendant discretionary authority based on misrepresentations is no less culpable than a defendant whose discretionary authority has been legitimately conferred.  See id. § 3B1.3 cmt. n.3.  Whether an individual is actually a stock broker, or is just pretending to be one, is the same for applying the abuse-of-trust enhancement.  This is because it makes no difference from the victim's perspective.  In either case, the defendant actually enters into a relationship of trust with the victim, who in turn grants the defendant discretion to act over his or her affairs.  In such circumstances, an imposter who falsely claims to be a stock broker and embezzles money invested with him has "the same opportunity to commit a difficult-to-detect crime," id., and is "as culpable and deserving of increased punishment" as an actual stock broker who does the same thing, id. § 3B1.3, Historical Notes, 1998 amend.

Application Note 3 does not eliminate the requirement that there be a relationship of trust between the defendant and the victim.  To the contrary, it

16

emphasizes that such a relationship remains the touchstone of the abuse-of-trust analysis. See id. § 3B1.3 cmt. n.3 (explaining that the enhancement should apply because "the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime"). This understanding is confirmed by the cases cited with approval in the application note, each of which involved a direct relationship of trust between the defendant and the victim. See Gill, 99 F.3d at 489 (applying enhancement to defendant posing as licensed psychologist, explaining that "in real life terms, [the defendant] occupied a position of trust relative to his counseling patients, and that [the defendant] took advantage of the patients' reliance on his claimed status as a psychologist to further his fraud scheme"); Queen, 4 F.3d at 929 (recognizing that the imposter investment advisor/broker in that case assumed a position of trust with his victims). Application Note 3 is therefore consistent with our precedent, which unambiguously requires a relationship of trust between the defendant and the victim. It does not support application of the enhancement in the absence of such a relationship.

Finally, we note that our decision is in keeping with the policies motivating the development and application of the abuse-of-trust enhancement. As we explained in Garrison, the "primary concern" of the enhancement is to deter and

17

punish defendants who use the discretion and autonomy provided to them by virtue of their positions to commit or conceal wrongs that are difficult to detect. 133 F.3d at 838. We also explained that persons who abuse authority entrusted to them by others are simply "more culpable," and thus deserving of harsher penalties. See id. at 837 (quoting U.S.S.G. § 3B1.3 cmt. background). As we noted:

> "The lesser degree of direct supervision exercised over fiduciaries or senior employees as opposed to cashiers, and hence the greater difficulty in detecting their transgressions, may explain part, but not all, of the distinction. . . . Where an individual makes himself particularly vulnerable by entrusting another with substantial authority and discretion to act on his behalf and then relies upon and defers to that person, a decision to take advantage of that trust and vulnerability is particularly abhorrent, as it undermines faith in one's fellow man in a way that the ordinary pickpocket simply cannot."

Id. at 839 n.18 (quoting United States v. Ragland, 72 F.3d 500, 502–03 (6th Cir. 1996)).

Neither of these concerns support extending the enhancement to the facts of this case. First, this was not a case in which a defendant maintained a lengthy relationship of trust with his victims.[5] Neither did Mr. Ghertler perpetrate difficult-to-detect frauds over time because he operated with little or no oversight from

---

[5] In contrast, Mr. Ghertler's frauds were "quick strikes" carried out over a period of hours that capitalized on professed urgency and an immediate need for funds to gain assent to his requests.

18

superiors.[6]  Rather, the manner in which he committed the offenses raised suspicions almost immediately because his frauds were overt and not in keeping with standard company practices.  Mr. Ghertler's offenses simply were not made difficult to detect by virtue of his impersonating company officials and abusing the discretion vested in those individuals.  Second, Mr. Ghertler did not abuse the trust that others had placed in him to act on their behalf.  Based on these facts, there is no basis for concluding that he is "more culpable" than any common fraudster.

In sum, Mr. Ghertler neither entered into nor abused a relationship of trust with the victims of his frauds.  Because such a relationship is required for the abuse-of-trust enhancement to apply, the district court erred by applying a two-level enhancement under § 3B1.3.

**IV.**

The district court also applied a two-level enhancement under U.S.S.G. § 2B1.1(b)(9)(C) based on its finding that Mr. Ghertler used sophisticated means to

---

[6] Compare, for example, Walker, 490 F.3d at 1300–01 (upholding enhancement for a state legislator who embezzled money from a charity he administered with "no oversight"), and United States v. Britt, 388 F.3d 1369, 1372 (11th Cir. 1991) (upholding enhancement for clerk of Social Security Administration who processed applications for Social Security cards and "was so loosely supervised that she was able, over a period spanning more than four years," to commit fraud without detection), vacated on other grounds, 546 U.S. 930, 126 S. Ct. 411 (2005), reinstated in part, 437 F.3d 1103 (11th Cir. 2006).

19

perpetrate his frauds or to avoid detection.[7]  Mr. Ghertler argues that this was error

because his offenses were not sufficiently complex or intricate, and did not include

sophisticated conduct intended to prevent the discovery of the offense.

"We review the district court's findings of fact related to the imposition of

sentencing enhancements, including a finding that the defendant used sophisticated

means, for clear error."  United States v. Clarke, 562 F.3d 1158, 1165 (11th Cir.

2009).  "[R]eview for clear error is deferential," United States v. Robertson, 493

F.3d 1322, 1330 (11th Cir. 2007), and "we will not disturb a district court's

findings 'unless we are left with a definite and firm conviction that a mistake has

been committed.'"  Clarke, 562 F.3d at 1165 (quoting United States v. Crawford,

407 F.3d 1174, 1177 (11th Cir. 2005)).

The Guidelines provide for a two-level enhancement if the offense in

question "involved sophisticated means."  U.S.S.G. § 2B1.1(b)(9)(C).

"Sophisticated means" refers to "especially complex or especially intricate offense

conduct pertaining to the execution or concealment of an offense," and ordinarily

---

[7] Alternatively, the PSR recommended a two-level enhancement under U.S.S.G. § 2B1.1(b)(9)(A) because "the defendant relocated or participated in relocating a fraudulent scheme to another jurisdiction to evade law enforcement."  Because we conclude that the record adequately supports the district court's finding that Mr. Ghertler used sophisticated means, we need not resolve the issue of whether Mr. Ghertler adequately objected to this additional ground for enhancement.

includes "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." Id. § 2B1.1 cmt. n.8(B). There is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement. Rather, it is sufficient if the totality of the scheme was sophisticated. See United States v. Wayland, 549 F.3d 526, 529 (7th Cir. 2008); United States v. Halloran, 415 F.3d 940, 945 (8th Cir. 2005); United States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003).

Although it is a close question, we cannot say that the district court clearly erred in finding Mr. Ghertler used sophisticated means to perpetrate or conceal his fraudulent scheme. The district court found that Mr. Ghertler had to conduct extensive research on the victim companies to develop inside information which facilitated the scheme to defraud; used unwitting couriers to pick up and deliver some of the proceeds of his frauds in an effort to conceal the scheme; forged false company documents, on at least one occasion referencing a confidential internal account number to facilitate the execution of his scheme; and had funds transferred to the accounts of unwitting third parties, who in turn withdrew and transferred cash to him. It is true that aspects of Mr. Ghertler's scheme were not sophisticated and that he sometimes made little or no effort to conceal either the fact of his fraud or his identity. Still, the totality of these activities carried out over an extended

period of time is sufficient to support the district court's finding that Mr. Ghertler used sophisticated means under our deferential standard of review. See, e.g., United States v. Campbell, 491 F.3d 1306, 1315–16 (11th Cir. 2007) (affirming sentence and holding in tax case that use of campaign accounts and credit cards issued to other individuals constituted sophisticated means designed to conceal defendant's fraud from authorities); Jackson, 346 F.3d at 25 (finding identity theft scheme to be sophisticated although each step of obtaining information about victim was relatively simple because "the total scheme was sophisticated in the way all the steps were linked together so that [the defendant] could perceive and exploit different vulnerabilities in different systems in a coordinated way"). Thus, the district court did not clearly err in applying a two-level enhancement for "sophisticated means" under § 2B1.1(b)(9)(C).

## V.

Mr. Ghertler argues that his sentence violates his rights under the Fifth and Sixth Amendments because his sentence was enhanced based on facts found by the district court at sentencing that were neither admitted by his guilty plea nor found by a jury.

We review de novo challenges to the constitutionality of a defendant's sentence. United States v. Chau, 426 F.3d 1318, 1321 (11th Cir. 2005).

22

As Mr. Ghertler acknowledges, our precedent holds that district courts are permitted to find facts at sentencing "so long as the judicial factfinding does not increase the defendant's sentence beyond the *statutory* maximum triggered by the facts conceded or found by a jury beyond a reasonable doubt." United States v. Hunt, 459 F.3d 1180, 1182 (11th Cir. 2006) (emphasis in original); see also United States v. Duncan, 400 F.3d 1297, 1302–03 (11th Cir. 2005) (rejecting argument that Sixth Amendment was violated where facts found by court allowed sentence to be imposed in excess of Guidelines range authorized by jury verdict). And it is undisputed that Mr. Ghertler's 185-month sentence is less than the statutory maximum for the offenses to which he pleaded guilty. Accordingly, Mr. Ghertler's argument that the district court's factfinding violated his Fifth and Sixth Amendment rights is foreclosed by our prior precedent.

Seeking to avoid this result, Mr. Ghertler contends that the Supreme Court has implicitly overruled our decisions on this issue. Relying primarily on Justice Scalia's concurring opinion in United States v. Rita, Mr. Ghertler argues that the "maximum sentence" that can be imposed under the Sixth Amendment must be confined to facts admitted by a defendant or found by a jury beyond a reasonable doubt. He then argues that because his 185-month sentence substantially exceeds the Guidelines range that would have been authorized by only the facts to which he

23

pleaded guilty, his sentence is unreasonable. He believes that the district court failed to offer a "sufficiently compelling" justification for such a major upward variance.

Although we acknowledge that the position Mr. Ghertler presses is not without its proponents, see Rita, 551 U.S. at 368–84, 127 S. Ct. at 2474–2484 (Scalia, J., concurring); United States v. White, 551 F.3d 381, 388–90 (6th Cir. 2008) (en banc) (Merritt, J., dissenting), we cannot accept it here. As stated above, our precedent squarely holds that sentencing judges may find facts under an advisory Guidelines system so long as the sentence imposed does not exceed the statutory maximum. Those decisions have not been overruled by an en banc decision of this Court or the Supreme Court of the United States and we are not free to disregard them. See United States v. Kaley, 579 F.3d 1246, 1255 (11th Cir. 2009) ("We may disregard the holding of a prior opinion only where that holding is overruled by the Court sitting en banc or by the Supreme Court. To constitute an 'overruling' for the purposes of this prior panel precedent rule, the Supreme Court decision must be clearly on point." (citations and quotations omitted)); United States v. Vega-Castillo, 540 F.3d 1235, 1237 (11th Cir. 2008) (explaining that "[f]or the Supreme Court to overrule a case, its decision must have actually

24

overruled or conflicted with this court's prior precedent," and that "[e]ven if the reasoning of an intervening high court decision is at odds with a prior appellate court decision, that does not provide the appellate court with a basis for departing from its prior decision" (quotations omitted)).  Accordingly, Mr. Ghertler is not entitled to relief based on the district court's factfinding at sentencing.

## VI.

In his final enumeration of error, Mr. Ghertler contends that the district court erred by enhancing his sentence based on evidence that was not sufficiently reliable.

"A sentencing court may consider any information, (including hearsay), regardless of its admissibility at trial, in determining whether factors exist that would enhance a defendant's sentence, provided that the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence."  United States v. Baker, 432 F.3d 1189, 1253 (11th Cir. 2005); see also U.S.S.G. § 6A1.3(a) ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").  A defendant has a due

process right, however, not to be sentenced based on false or unreliable information. See United States v. Reme, 738 F.2d 1156, 1167 (11th Cir. 1984). To prevail on a challenge to a sentence based on the consideration of such information, a defendant must show (1) that the challenged evidence is materially false or unreliable and (2) that it actually served as the basis for the sentence. United States v. Bourne, 130 F.3d 1444, 1447 (11th Cir. 1997); United States v. Taylor, 931 F.2d 842, 847 (11th Cir. 1991); United States v. Rodriguez, 765 F.2d 1546, 1555 (11th Cir. 1985). It is the defendant that "bears the burden of showing that the court explicitly relied on the information." Taylor, 931 F.2d at 847 (emphasis removed).

In general, Mr. Ghertler challenges the district court's consideration of three categories of evidence. We address each briefly in turn.

First, Mr. Ghertler argues that the district court should not have considered the voice identification testimony of two couriers used to pick up and transfer the proceeds from two different frauds. He characterizes this evidence as unreliable in light of the witnesses's relatively brief conversations with the perpetrator, the length of time between their conversations and their identifications, and the government's failure to have them identify the voice out of a group of voices. He

26

believes that consideration of this evidence mandates reversal. We do not agree.

The voice identification testimony Mr. Ghertler complains about was introduced to prove that Mr. Ghertler committed the frauds against Wachovia and Bank of New York. However, upon his arrest, Mr. Ghertler admitted defrauding both of these institutions. In light of his confession, which the district court found to be freely and voluntarily given (a determination that Mr. Ghertler does not appeal), the couriers' voice identification testimony was merely corroborative of Mr. Ghertler's own statements and unnecessary to the district court's finding that Mr. Ghertler perpetrated these frauds. Based on this, Mr. Ghertler cannot establish that the district court either relied on the challenged testimony or that it "actually served as the basis for the sentence." Taylor, 931 F.2d at 847 (quotations omitted). The consideration of the voice identification testimony therefore does not entitle Mr. Ghertler to relief.[8]

Second, Mr. Ghertler challenges the district court's consideration of

---

[8] Mr. Ghertler's assertion that his sentence must be reversed because the district court included one of the couriers as a victim in this case and ordered restitution is also meritless. It is undisputed that the courier picked up funds from the fraud against Bank of New York; that he was wrongly implicated in the fraud and arrested; that he now has an arrest record (which he may or may not be able to have expunged); and that he incurred legal fees and expenses as a result. This unfortunate series of events was a direct and foreseeable result of the fraud against Bank of New York, which, again, Mr. Ghertler admitted to committing. That being so, the reliability of the courier's voice identification is irrelevant to the district court's finding that the courier was a victim of Mr. Ghertler's fraud entitled to restitution.

27

statements made by Robert Sena that came into evidence through the testimony of the investigative agent. Mr. Sena acted as a conduit for the proceeds from the Ropes & Gray fraud, and told the agent about deposits into his bank account and subsequent transfers to Mr. Ghertler. These statements were admitted for the purpose of establishing that Mr. Ghertler was responsible for the fraud against Ropes & Gray. The district court found these statements sufficiently reliable because they were corroborated by deposit records from the bank, photographs from the bank's surveillance cameras, Mr. Ghertler's own statements, and other evidence.

Given the corroborative evidence identified by the district court, Mr. Sena's hearsay statements had sufficient indicia of reliability to be considered at sentencing. This is particularly true because Mr. Ghertler testified at sentencing and admitted his involvement in the Ropes & Gray fraud. Based on this record, the district court's finding that Mr. Ghertler was responsible for this fraud did not depend on Sena's hearsay statements. Mr. Ghertler therefore is not entitled to relief.

Finally, Mr. Ghertler challenges the district court's consideration of written statements from two convicted felons, Scott Trout and Melanie Porter, describing

28

their relationship with Mr. Ghertler. He argues that double-hearsay testimony of convicted felons lacks, as a matter of law, sufficient indicia of reliability to be considered by a sentencing court for any purpose and that his sentence must be vacated and remanded based the admission of this testimony. Again, we do not agree.

The evidence presented at sentencing showed that on September 15, 2008, someone posing as a partner at the law firm of Howrey & Simon, LLP contacted another partner at that firm requesting assistance in obtaining a wire transfer in the amount of $45,000, purportedly to cover the costs of retaining local counsel relating to a potential new matter. The caller requested that $45,000 be transferred to the account of local counsel, whom he identified as "J.D. Ghertler." The caller provided the information Howrey needed to process the request, including Mr. Ghertler's bank account number and correct Social Security Number. Howrey wired the funds to Mr. Ghertler's bank account as requested. On the same day, a check made out to Mr. Trout, which Mr. Ghertler admits he signed, was drawn on that account. Over the next couple of weeks, and while Mr. Ghertler remained a fugitive, several more checks made out to Ms. Porter would be drawn on the same account.

The United States offered the Trout and Porter statements for the limited purpose of showing that Mr. Ghertler knew them. Mr. Ghertler admitted that he knew Mr. Trout and did not object to the admission of Mr. Trout's statement for that purpose. He claimed, however, that he did not know Ms. Porter and objected to the district court's consideration of her statement.

In light of all of the evidence presented at sentencing, the district court's admission of the Trout and Porter statements does not warrant reversal. The evidence was more than sufficient to support the district court's finding that Mr. Ghertler committed the Howrey fraud independent of those statements. The Howrey fraud was committed in a manner virtually identical to the other frauds Mr. Ghertler committed. It is undisputed that the Howrey funds were wired directly to Mr. Ghertler's bank account, that Mr. Ghertler knew Mr. Trout, and that Mr. Ghertler signed the check made out to Mr. Trout drawing upon those funds. In any event, Mr. Ghertler's denial of any involvement in the Howrey fraud was substantially undermined by the fact that he also denied involvement in frauds that he specifically confessed to committing upon his arrest. Based on this evidence, the district court's finding that Mr. Ghertler committed the Howrey fraud was plainly supported by the record even excluding the Trout and Porter statements.

This being the case, Mr. Ghertler has not met his burden of showing that the Trout and Porter statements served as the basis for the district court's finding that Mr. Ghertler committed the Howrey fraud.

## VII.

For these reasons, the sentence imposed by the district court is affirmed in part, vacated in part, and the case is remanded for resentencing consistent with this opinion.

AFFIRMED IN PART, VACATED AND REMANDED, IN PART.