**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Christopher JACKSON, Defendant–**
**Appellant.**

No. 14–15637
**Non–Argument Calendar**

United States Court of Appeals,
Eleventh Circuit.

Date Filed: 06/28/2016

Carol Herman, Michael Berger, Eloisa Delgado Fernandez, Wifredo A. Ferrer, Kathleen Mary Salyer, Emily M. Smachetti, U.S. Attorney's Office, Miami, FL, for Plaintiff–Appellee.

Marcia G. Shein, Law Office of Shein & Brandenburg, Decatur, GA, for Defendant–Appellant.

Before HULL, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Christopher Jackson appeals his 78–month sentence and $2,088,677.53 restitution after pleading guilty to one count of mail fraud, in violation of 18 U.S.C. § 1341. We affirm.

## I.  BACKGROUND

Jackson was charged by information with committing two counts of mail fraud. Count 1 alleged Jackson mailed two fraudulent tax-refund checks from Florida to Ohio on April 11, 2014; Count 2 alleged Jackson mailed one fraudulent tax-refund check from Florida to Ohio on April 22, 2014. The information alleged these checks were sent as part of a scheme, lasting from December 2011 through April 22, 2014, in which Jackson sent hundreds of fraudulently obtained tax-refund checks, totaling approximately $2 million, and corresponding fraudulent identification documents to a check casher in Ohio for cashing. Pursuant to a written plea agreement, Jackson pled guilty to Count 1 of the information; Count 2 was dismissed. In his plea agreement, Jackson reserved the right to contest the alleged $2 million loss amount at sentencing.

Jackson executed a factual proffer with his plea agreement. The proffer states, at some unspecified time, Jackson began mailing tax-refund checks from Miami, Florida, to James Powers at United Check Cashing ("United") in Cincinnati, Ohio. Powers would cash the checks and repay Jackson by sending him cash through the mail. Law enforcement became aware of fraudulent tax-refund checks being cashed at United and approached Powers, who agreed to cooperate. In March 2014, Powers contacted Jackson and asked him to send tax-refund checks. On April 11, 2014, Jackson went to a post office in Miami and prepared an envelope to send to United; he used a false name and return address. Jackson concealed two tax-refund checks, totaling $6,451, inside a book and placed the book in the envelope for mailing. Law enforcement took a fingerprint sample from the book; the fingerprints taken matched Jackson's fingerprints. Jackson admitted in his proffer that both checks were obtained through the filing of fraudulent tax returns; he knew the tax-refund checks had been obtained by fraud. Neither of the individuals to whom the checks were addressed lived at the address listed on the tax-refund checks, was aware of the tax-refund checks in their names, nor had authorized Jackson to cash those checks.

In the presentence investigation report ("PSI"), the probation officer assigned Jackson (1) a 16–level enhancement under U.S.S.G. § 2B1.1(b)(1)(I), since the amount of loss was more than $1 million but less than $2.5 million, (2) a 6–level enhancement under U.S.S.G. § 2B1.1(b)(2)(C), because the crime involved 250 or more victims, and (3) a 2–level enhancement under U.S.S.G. § 2B1.1(b)(11)(C)(ii), since the crime involved the possession of five or more means of identification that were un-

lawfully produced from, or obtained by, the use of another means of identification. Jackson objected to each of these enhancements as well as the underlying factual allegations on which the probation officer relied in applying them.

At the first sentencing hearing on December 4, 2014, the government presented the testimony of James Powers, the owner of United, an unindicted co-conspirator, and Special Agent Jason Leighton, of the Internal Revenue Service ("IRS"). Powers testified he was introduced to Jackson in 2011 by Glenda Johnson, Jackson's cousin, who told him Jackson prepared taxes in Florida and needed someone to cash tax-refund checks for him. Powers began receiving tax-refund checks from Jackson in 2011 and continued to receive these checks from Jackson throughout 2012. In 2012, Powers cashed approximately $2.3 million in tax-refund checks for Jackson. Initially, Jackson provided copies of Florida driver's licenses along with the checks he sent to Powers but later stopped sending identification documents, although Powers generally required such documentation. Powers estimated he received more than 100 copies of driver's licenses before Jackson stopped sending them.

At the end of 2012, Powers began receiving notifications from his bank that many of the checks Jackson had sent, totaling approximately $140,000, had been reclaimed by the Department of Treasury. Powers contacted Jackson about the reclamation notices to find out what was happening, but Jackson provided only vague responses. Powers testified he believed he had received a total of 150 to 200 checks from Jackson but was unsure of the exact number. Powers admitted he never personally saw Jackson place any of the tax-refund checks in the mail but, based on his communications with Jackson, he explained it was his understanding all of the

tax-refund checks he received from South Florida came from Jackson. To his knowledge, none of the tax-refund checks were sent by Glenda Johnson.

Agent Leighton testified 513 U.S. Treasury checks were cashed in Powers's bank account in 2012. Of those tax-refund checks, 485 had Florida addresses; only one had an Ohio address. Approximately 183 of the tax-refund checks were from tax returns filed in years other than 2012. Agent Leighton stated he took a sampling of nineteen names from the tax-refund checks and ran the Social Security numbers associated with those names to determine whether those individuals resided at the addresses listed on the tax-refund checks. Of those nineteen individuals, only two had addresses on file that corresponded to the address listed on the tax-refund check. For the remaining seventeen names, there was no evidence those individuals were connected with the address listed on their tax-refund checks. During a recess in the proceedings, Agent Leighton conducted a search with an additional sample of twenty individuals; for fourteen of those individuals, he found the address on the tax-refund check did not correspond to their addresses of record. Without interviewing any of the individuals involved, he conceded he could not say with certainty whether any particular tax-refund checks were fraudulent. Agent Leighton further testified he reviewed a spreadsheet, prepared by another agent, which listed the driver's license numbers for the identifications Jackson had provided to Powers. Agent Leighton ran five of those driver's license numbers through the Florida database and found none of the numbers matched records in the database.

Following Powers and Agent Leighton's testimony, the government argued it had satisfied its burden of proving the challenged enhancements and had shown all of

the tax-refund checks were fraudulent. Jackson contended the testimony presented was not sufficient, because it failed to establish definitively either that Jackson sent all of the tax-refund checks or that all of the tax-refund checks were fraudulent. The district judge directed the government to conduct additional analysis on the tax-refund checks at issue and continued the sentencing hearing for that purpose.

In advance of the second sentencing hearing, the government submitted a sentencing memorandum, summarizing its additional analysis concerning the 513 tax-refund checks cashed by Powers in 2012. The total amount of those 513 tax-refund checks was $2,366,006.65. The government determined four of the tax-refund checks, totaling $20,482, came from taxpayers who lived within a 50–mile radius of Powers's business and appeared to be legitimate.

The government argued the remaining 509 tax-refund checks were plainly fraudulent, and their fraudulent nature could be established by a preponderance of the evidence based on the following facts. First, 456 (90 percent) of the tax-refund checks had addresses that did not match the taxpayer's address of record. The government explained this was an indication of fraud, because it was unlikely a taxpayer would cause their tax-refund check to be sent to an address with which he or she never had been associated. Regarding the 53 tax-refund checks that contained matching addresses, the government argued many, if not all, of those tax-refund checks likely were stolen from the mail. For 24 of the 53 tax-refund checks, the government had received taxpayers' affidavits stating they had not received their tax-refund checks.

In addition, the government stated the tax returns underlying the 509 tax-refund checks cashed in 2012 contained numerous indicators of fraud. Many of the tax returns were for tax years prior to 2012, including 21 returns from 2005, 2008, and 2009, 164 returns from 2010, and 323 returns from 2011. In addition, at least 213 of the returns came from populations that typically do not file tax returns. Specifically, 71 returns came from individuals age 70 and older, 61 returns came from individuals age 20 and under, 31 returns came from deceased individuals, 30 returns came from Puerto Rican citizens, and 16 returns came from prisoners. Furthermore, 170 of the returns reported no wages but claimed large tax refunds; many of the returns claimed identical tax-refund amounts. Finally, a substantial number of returns were filed well after the end of the tax-filing season, a factor highly correlated with fraud.

At the continuation of the sentencing hearing on December 16, 2014, Agent Leighton testified regarding the information contained in the government's sentencing memorandum. The government also admitted into evidence two spreadsheets, containing information about each of the tax returns associated with the tax-refund checks at issue in this case, which provided the basis for Agent Leighton's testimony and the government's sentencing memorandum. Agent Leighton explained the returns associated with Puerto Rican citizens were suspect because, unless they work for the federal government, Puerto Rican citizens are not subject to federal income tax. Agent Leighton conceded he did not investigate to determine whether any of the Puerto Rican tax returns in this case were filed by government employees. He also acknowledged an indicator of fraud did not necessarily mean a return is fraudulent; without interviewing all of the taxpayers involved, he could not say definitively all of the tax-refund checks were fraudulent. Agent Leighton further explained (1) there were some situations in which a person who reported no

wages could nevertheless be entitled to a tax refund, (2) a surviving spouse or executor could file a final tax return on behalf of a deceased individual, and (3) it was not illegal for prisoners to file tax returns.

Following Agent Leighton's testimony, the government argued all 509 of the relevant tax-refund checks were fraudulent. In support of this argument, the government noted (1) Jackson admitted in his factual proffer to sending two fraudulent tax-refund checks in 2014; (2) all of the identification documents in the sample the government had checked were fraudulent; (3) Powers testified all of the checks came from Jackson; (4) the addresses on 90 percent of the tax-refund checks did not match the taxpayers' addresses of record; (5) of the 53 returns that had matching addresses, 24 taxpayers filed affidavits stating they did not receive their tax-refund check, indicating those checks were stolen from the mail; and (6) more than 200 of the returns were filed by categories of individuals who typically would not file returns. Cumulatively, the government contended these facts showed all of the returns were fraudulent.

In response, Jackson argued the government failed to determine which tax-refund checks actually were fraudulent, despite having ample time and resources to make this determination. Jackson further asserted the government had not met its burden of showing the loss amount exceeded $1 million or there were more than 250 victims. Because the government had not met its burden or determined which tax-refund checks were fraudulent, Jackson contended he should not be held responsible for the $2.3 million loss amount.

The district judge stated she had reviewed the government's sentencing memorandum and was "very persuaded that the government had gone back, and with the information it had, it had culled

through and was giving me a number of indicators of fraud, and the testimony today matches that sentencing memorandum." R. at 257. She further stated the government had shown by a preponderance of the evidence the Sentencing Guidelines calculations in the PSI were correct. The judge sentenced Jackson to 78 months of imprisonment, at the bottom of his Guidelines range as calculated in his PSI.

On January 30, 2015, the district judge held a restitution hearing. Prior to the hearing, the government filed a restitution memorandum, in which it stated it sought repayment of only the 485 Florida tax-refund checks, which totaled $2,217,689.26. The government further noted the Department of Treasury already had reclaimed $129,011.73 from Powers's bank account. Therefore, the government sought restitution in the amount of $2,088,677.53.

At the restitution hearing, Agent Leighton testified the 485 Florida tax-refund checks totaling $2,217,689.26 and $129,011.73 had been reclaimed. He acknowledged some of the money from the Florida tax-refund checks could be legitimate. While he stated he had the opportunity to do so, he did not send letters or contact victims to determine the exact amount of restitution Jackson owed. On questioning by the judge, Agent Leighton conceded he could not say definitively the entire amount of the Florida tax-refund checks was fraudulent. He reiterated there were indicators of fraud concerning those tax-refund checks and summarized his previous testimony concerning those indicators of fraud. The government argued the evidence presented at sentencing established the tax-refund checks came from Jackson and were fraudulent. The government acknowledged it was possible some of the checks were not fraudulent but asserted no evidence had been presented to sug-

gest any of the tax-refund checks were legitimate.

Jackson argued the government was required to prove the exact amount of restitution owed, but it had failed to produce that proof. Despite having the opportunity to do so, Agent Leighton reiterated he had not contacted the alleged victims to find out which tax-refund checks were fraudulent. Furthermore, Agent Leighton could state with certainty the reclaimed amount of approximately $129,000 was fraudulent. Jackson contended the indicators of fraud relied on by the government did not suffice to prove the exact amount of restitution. Because the government did not prove Jackson was responsible for the full amount of the tax-refund checks, he argued the judge could not hold him responsible for that amount.

The judge found the government had made a sufficient showing to support the requested amount of restitution by a preponderance of the evidence, and ordered restitution in the amount of $2,088,677.53. On appeal, Jackson argues the judge violated his right to due process by relying on unreliable evidence in resolving the disputed sentencing issues regarding the amount of loss, number of victims, and use of five or more means of identification as well as the restitution amount. Jackson asserts Powers's testimony was unreliable, because (1) as an unindicted co-conspirator, he had a strong motive to remain unindicted by placing the blame entirely on Jackson; (2) he did not have records to substantiate his communications with Jackson and could not state with certainty that Jackson, rather than Glenda Johnson, was the one sending him the tax-refund checks; and (3) his testimony about the number of tax-refund checks he received from Jackson (150–200) was inconsistent with Agent Leighton's testimony there were a total of 513 checks. He argues Agent Leighton's testimony was likewise unreliable, because Agent Leighton could not testify all of the tax-refund checks were fraudulent and did not conduct interviews to determine which tax returns were fraudulent, although he could have done so. Jackson further maintains the government's sentencing memorandum and Agent Leighton's testimony are unreliable, since the government did not present any evidence or legal authority in support of the claimed indicators of fraud. Consequently, Jackson contends the evidence presented at sentencing and at the restitution hearing was insufficient to support the sentencing enhancements he received and the restitution amount imposed. Finally, Jackson requests the government be precluded from presenting additional evidence on remand.

## II. DISCUSSION

We review de novo constitutional challenges to a defendant's sentence. *United States v. Ghertler*, 605 F.3d 1256, 1268 (11th Cir. 2010). We review the district judge's application of the Sentencing Guidelines de novo and its findings of fact for clear error. *United States v. Flanders*, 752 F.3d 1317, 1339 (11th Cir. 2014), *cert. denied*, —— U.S. ——, 135 S.Ct. 1188, 191 L.Ed.2d 143 (2015). We review the legality of a restitution order de novo and the factual findings underlying that order for clear error. *United States v. Rodriguez*, 751 F.3d 1244, 1260 (11th Cir.), *cert. denied*, —— U.S. ——, 135 S.Ct. 310, 190 L.Ed.2d 225 (2014). Credibility determinations typically are the province of the factfinder; we generally will defer to the district judge's credibility determination, unless the testimony is exceedingly improbable so no reasonable factfinder could accept it. *United States v. Ramirez–Chilel*, 289 F.3d 744, 749 (11th Cir. 2002).

The government bears the burden of proving both the applicability of sentenc-

ing enhancements and the amount of restitution by a preponderance of the evidence. *Rodriguez*, 751 F.3d at 1261 (restitution); *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013) (sentencing enhancements). Under that standard, the burden is satisfied if the trier of fact "believe[s] that the existence of a fact is more probable than its nonexistence." *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012) (citation and internal quotation marks omitted). Due process requires the evidence presented bear "minimal indicia of reliability," and the defendant be given the opportunity to refute that evidence. *Rodriguez*, 751 F.3d at 1261 (restitution); *see also United States v. Giltner*, 889 F.2d 1004, 1007 (11th Cir. 1989) (sentencing enhancements). Where a defendant challenges his sentence because the judge relied upon false or unreliable information, the defendant must show "(1) that the challenged evidence is materially false or unreliable and (2) that it actually served as the basis for the sentence." *Ghertler*, 605 F.3d at 1269.

■ Jackson's due process claim fails, because he cannot show the evidence relied upon by the judge was materially false or unreliable. *See id.* at 1269. First, Jackson contends Powers's testimony was inherently unreliable, since he is an unindicted co-conspirator and therefore had a motive to stay unindicted and accuse Jackson. But Jackson had the opportunity to cross-examine Powers concerning his bias and motivation for testifying; it was within the judge's discretion to determine whether and to what extent to credit Powers's testimony. *See Ramirez–Chilel*, 289 F.3d at 749.

■ Jackson also contends Powers's testimony was unreliable, because (1) Powers could not state with certainty Jackson had mailed the tax-refund checks; (2)

Powers did not provide phone records to substantiate his communications with Jackson; and (3) Powers's testimony concerning the number of tax-refund checks was inconsistent with Agent Leighton's testimony. These arguments are unavailing. The mere fact Powers was not physically present when Jackson mailed the tax-refund checks does not render unreliable his testimony he understood, based on his communications with Jackson, that Jackson was the person sending the tax-refund checks. Although Powers did not have telephone records to substantiate his testimony, Jackson's fingerprints were found on the book containing the two fraudulent tax-refund checks Jackson sent to Powers in April 2014, which evidenced Jackson was the person who had sent those tax-refund checks and provided circumstantial evidence to corroborate Jackson also sent the 2012 refund checks. Likewise, Powers's inaccurate testimony concerning the number of checks does not suggest his testimony is otherwise unreliable. Powers acknowledged he was unsure of the exact number of tax-refund checks; it is not unreasonable to conclude Powers may have forgotten some details in the two years that had elapsed between the transactions at issue and the sentencing hearing. Furthermore, Powers's testimony concerning the total amount of the tax-refund checks ($2.3 million) was consistent with the amount identified in the IRS investigation and with Agent Leighton's testimony.

■ Jackson also challenges Agent Leighton's testimony and the government's sentencing memorandum, because they relied on indicators of fraud rather than direct evidence that each individual tax return was fraudulent. Significantly, the issue before us is whether the evidence actually presented by the government was reliable and sufficient to satisfy its burden of proof, not whether the government

could have produced better evidence. *See Ghertler*, 605 F.3d at 1269. That the government could have taken further investigative steps to obtain direct evidence has no bearing on the reliability of the circumstantial evidence it did produce. Agent Leighton's acknowledgment of some circumstances in which tax returns containing indicators of fraud might be legitimate does not render his testimony concerning those factors false or unreliable. Instead, it is consistent with his testimony that, though the indicators suggest fraud, they do not in themselves definitively establish a tax return is fraudulent. Therefore, Agent Leighton merely acknowledged the indicators provided circumstantial, rather than direct, evidence of fraud.

Furthermore, other evidence suggests the indicators of fraud are reliable in this case. Jackson eventually stopped sending identification documents along with the tax-refund checks, although Powers typically required this documentation, and a sample of five of the Florida driver's license numbers Jackson did provide revealed none of those numbers were on file in the Florida database. In addition, identity-theft affidavits were filed for 24 of the tax returns at issue, resulting in the reclamation by the Treasury Department of approximately $130,000 in fraudulent tax refunds. Finally, Jackson admitted to knowingly sending fraudulent tax-refund checks in 2014; as with the majority of the tax-refund checks sent in 2012, the addresses on those checks did not match the taxpayers' addresses of record.

In summary, the evidence on which the judge relied was not materially false or unreliable; consequently, the judge did not violate Jackson's right to due process by relying on that evidence. *See Ghertler*, 605 F.3d at 1269. Furthermore, the evidence was sufficient to establish the challenged sentencing enhancements and restitution amount by a preponderance of the evidence. *Rodriguez*, 751 F.3d at 1261; *Washington*, 714 F.3d at 1361. First, Agent Leighton's testimony concerning the various indicators of fraud associated with the returns as well as the other circumstances already addressed demonstrated the tax-refund checks more likely than not were fraudulent. *See Almedina*, 686 F.3d at 1315. Second, Powers and Agent Leighton's testimony established (1) Jackson had sent more than 500 fraudulent tax-refund checks to Powers, evidencing there were more than likely 250 victims; (2) the tax-refund checks totaled approximately $2.3 million, demonstrating the amount of loss was more than $1 million but less than $2.5 million; and (3) Jackson had sent at least five false driver's licenses to Powers, showing the crime involved the use of five or more means of identification that were unlawfully produced from, or obtained by, the use of another means of identification. *See* U.S.S.G. §§ 2B1.1(b)(1)(I), (b)(2)(C), (b)(11)(C)(ii). Third, at the restitution hearing, Agent Leighton testified the 485 Florida tax-refund checks for which the government sought restitution totaled $2,217,689.26, the IRS already had reclaimed $129,011.73, and the indicators of fraud relied on at sentencing demonstrated the entire amount was derived from fraudulent tax returns.

**AFFIRMED.**