[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-13101
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 1, 2011
JOHN LEY
CLERK

D.C. Docket No. 1:09-cr-20928-UU-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EFREN MENDEZ,
a.k.a. Efren Mendez Valdez,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 1, 2011)

Before WILSON, FAY and BLACK, Circuit Judges.

PER CURIAM:

Efren Mendez appeals his 78-month sentence for conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. He argues, first, that the district court erred in applying a two-level enhancement to his base offense level, pursuant to U.S.S.G. § 2B1.1(b)(9)(C), for the use of sophisticated means. The government, which took the position at sentencing that the sophisticated-means enhancement was inapplicable, now contends that the district court did not err in imposing the enhancement. Additionally, Mendez argues on appeal that the district court failed to consider adequately the 18 U.S.C. § 3553(a) sentencing factors. For the reasons set forth below, we affirm.

I.

Between October 13, 2003, and November 5, 2004, Research Center of Florida, Inc. ("Research Center") submitted Medicare claims for more than $21 million, on which Medicare actually paid $10,944,088. The majority of the claims were for treatment of HIV-positive patients with prescription drugs, but, in fact, little or none of the claimed treatment was provided to the patients. Mendez was Research Center's vice president and an unnamed co-conspirator ("CC1") was its president.

Research Center obtained its patients from two sisters, Caridad and Barbara Perez. Mendez agreed to pay the sisters 30% of what Research Center made from

2

billing for the patients. Dr. Jose Napoles sometimes met with CC1 and Mendez to recommend which treatments to bill, based on how much Medicare was paying for those treatments. They did not discuss what treatments the patients needed. Mendez and CC1 agreed to the arrangement with the sisters and decided which types of claims to submit to Medicare. They caused Research Center employees, including Mendez's codefendant, Damian Beltran, to prepare and sign forms in which they falsely purported to have provided the specified treatments. Mendez and CC1 submitted the false and fraudulent claims to Medicare.

The sisters arranged for another individual, Idalmis Gonzalez, to pay cash kickbacks to the patients whom the sisters supplied to the clinic. CC1 and Mendez gave the cash for the kickbacks to either Gonzalez or Barbara. Research Center also paid Barbara, Caridad, and Napoles for providing patients and billing advice by making payments into shell companies controlled by those three individuals. CC1 signed all of the checks to the shell companies, except for one check signed by Mendez.

During the period at issue, Research Center paid Mendez $755,636.66. Research Center also wrote checks to three additional shell companies: Research Center Phase I-IV of Florida Corp., whose president and vice president were CC1 and Mendez; Olmen International Investment LLC ("Olmen"), whose sole officer

3

was Mendez's ex-wife, Olga Perez; and Efol Investment LLC ("Efol"), whose sole officer during the relevant period was Olga. Research Center Phase I-IV, in turn, transferred part of its payments to Efol, Olmen, and entities that appeared to benefit its other officers.

In September and October 2004, Research Center wrote four checks, all signed by CC1, to a law firm. On November 30, 2004, Olga signed two Efol checks to the law firm, but those checks were deposited back into the Efol account the next day. On December 1, Mendez signed two Research Center checks to the firm, which were deposited back into Research Center's account the next day. On December 17, Olga signed another Efol check to the firm. Of the funds that were paid into the law firm but not redeposited in the payers' accounts, half of the money from Research Center and all of the money from Efol was used to purchase a piece of undeveloped land, which was then placed in Efol's name. In April 2005, Mendez paid his personal income taxes with money from Olmen and Efol. In August 2005, Efol traded its parcel of land back to the seller in exchange for a different parcel of land. The next year, Efol sold that lot for approximately $502,000, and subsequently wired $500,000 to a bank account in Spain.

In 2009, a federal grand jury returned a superseding indictment charging Mendez in seven counts: (1) conspiracy to commit health care fraud, in violation

4

of 18 U.S.C. § 1349, (2) health care fraud, in violation of 18 U.S.C. § 1347, (3) conspiracy to pay health care kickbacks, in violation of 18 U.S.C. § 371, (4) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and (5-7) money laundering, in violation of 18 U.S.C. § 1957. He pled guilty to Count 1 pursuant to a written agreement by which the government would dismiss the remaining counts.

In calculating Mendez's guideline sentencing range, the probation office applied a base offense level of 6, pursuant to U.S.S.G. § 2B1.1(a)(2). Because Mendez was responsible for a loss of $16,835,185.60, his offense level was increased by 20 levels, pursuant to § 2B1.1(b)(1)(K). Another two levels were added, pursuant to § 2B1.1(b)(9)(C), for the use of sophisticated means. With respect to Mendez's role in the offense, the probation office concluded that CC1 appeared to be the most culpable individual in this case, but that Mendez was a manager or supervisor. Accordingly, a three-level role adjustment was added, pursuant to U.S.S.G. § 3B1.1(b). With a 3-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a)-(b), Mendez had a total offense level of 28. His absence of a criminal history placed him in criminal history category I and yielded a guideline range of 78 to 97 months' imprisonment.

Both the government and Mendez objected to the application of a sophisticated-means enhancement. The government argued that the offense involved only a single clinic, whose true owners' names were on the corporate records, and application of the enhancement to this case would require application to all cases involving fraud by HIV clinics. The government also noted that the enhancement had not been applied to the defendants in related cases. Mendez argued that there was no evidence of especially complex or intricate conduct pertaining to the execution or concealment of the offense, and there was no deliberate act to conceal or hide any transaction in which Mendez or Research Center was involved. Mendez also submitted a brief sentencing memorandum that described the circumstances of his arrival in the United States from Cuba, his family, his remorse, and his position that the offense did not involve sophisticated means.

At the sentencing hearing, the court stated that Mendez was a principal of Research Center, not a mere employee, and he had a role in directing the distribution of the money. The use of shell corporations to move the money around would warrant the two-level enhancement for the use of sophisticated means. The government argued that Mendez's role as a principal in the company was reflected in the aggravating-role enhancement. It contended that the fraud, as

6

opposed to the money laundering, was not unusually sophisticated. The court asserted that "the fraud doesn't stop with the fraud, because the fraud generates fraud proceeds," so "[t]he fraud stops where the money ends."

Mendez argued that the sophisticated-means enhancement was intended to address concealment that was carried out in a sophisticated, intricate way, and the fraud did not involve "an especially complex setup" as compared to other Medicare-fraud cases. Furthermore, Beltran, his codefendant, had not been subject to the enhancement, and the logic should be the same because they were co-conspirators. The court described the scheme as having involved "creating an entity which purports to provide legitimate medical services and then creates a charade by which those services are not performed," as well as creating "documents for submission to a [g]overnment agency reflecting that services were rendered that were not rendered, . . . includ[ing] medical diagnoses and perhaps the results of scientific diagnostic tests." The court maintained that Mendez's and Beltran's situations were different because Beltran did not set up the clinic, decide how to attract patients, or determine which services would be performed, and he was a mere employee with no managerial responsibility.

The government added that "it would be really unfair" to apply the enhancement to Mendez, not only in comparison to the universe of Medicare-fraud

cases, but because Mendez had been involved in only the first of the six related clinics involved in this overall investigation. Furthermore, in the 22 convictions that had taken place so far with respect to this investigation, no defendant received a sophisticated-means enhancement, even if his or her fraud was more sophisticated than Mendez's, unless he or she was involved in operating more than one clinic and using "nominee" owners to conceal the principals' identities. The government acknowledged that the use of shell corporations to send some of his money to a foreign country was "not . . . irrelevant," but it considered the fact that he had operated the clinic openly in his own name to be more significant. It opined that evidence of money laundering was not the same as evidence that the fraud was sophisticated in nature.

Mendez added that the other clinics' use of nominee owners affected the issues of concealment and complexity of the "setup," but in the case of Research Center, everyone's real name was used. He further asserted that the shell companies had not been formed for illicit purposes, but, rather, had been formed on the advice of another attorney for the purpose of investing in real estate.

The court stated that "the money in these cases finds its way offshore time and time and time again," and the reason for that "has to do with concealment and . . . ensuring that the defendant is going to be able to enjoy the fruits of the fraud."

The government has difficulty recovering the money in such cases because it is sent offshore. The court concluded that this fact could not be separated from the fraud. The facts of the case reflected sophistication in both the execution and the concealment of the disposition of the funds. There was overlap with the role-adjustment determination, as the offense involved the formation of a corporation, a decision as to its business purpose of providing sophisticated medical services, a business model of creating a fiction that those services were being provided, and execution of a charade that involved recruiting and paying patients, as well as creating tens of thousands of documents to support $20 million in billing. The scheme was made more sophisticated by the use of shell corporations to distribute funds and move the money offshore. Thus, the enhancement applied.

Both parties recommended a low-end guideline sentence. Mendez and his attorney both declined to make any further statement before the court imposed sentence. The court stated that it had "considered the statements of the parties, the presentence report containing the advisory guidelines, and the statutory factors." Mendez was sentenced to 78 months' imprisonment and ordered to pay restitution. Mendez objected only to the sophisticated-means enhancement.

## II.

We review for clear error the district court's finding that the defendant used sophisticated means. *United States v. Robertson*, 493 F.3d 1322, 1329-30 (11th Cir. 2007). "A factual finding is clearly erroneous when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 1330 (quotation marks omitted).

Section 2B1.1(b)(9) imposes a two-level increase "[i]f (A) the defendant relocated . . . a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means." Application Note 8 explains,

> "[S]ophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1, comment. (n.8(B)). There is no requirement that each of the defendant's actions be sophisticated; it is sufficient if the totality of the scheme

10

was sophisticated. *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010).

In each case in which we have upheld the application of a sophisticated-means enhancement, the defendant used false identities, fraudulent accounts, or fictitious entities to conceal his participation in the scheme or to execute and conceal the fraudulent transactions. *See id.* at 1260, 1267-68 (noting that defendant developed inside information on victim companies, impersonated high-ranking company officials, forged false company documents, referenced a confidential internal account number, and used unwitting third parties to receive the cash transfers); *United States v. Jennings*, 599 F.3d 1241, 1246, 1248, 1254 (11th Cir. 2010) (describing the formation and use of two fictitious insurance companies to issue illegitimate insurance, the use of third-party administrators to shield the fictitious entities from claimants and regulators, and the provision of misleading certificates of insurance to conceal the fraud); *United States v. Clarke*, 562 F.3d 1158, 1165-66 (11th Cir.), *cert. denied*, 130 S.Ct. 809 (2009) (upholding U.S.S.G. § 2T1.1(b)(2) enhancement because defendant concealed tax fraud by depositing salary into accounts not registered in his own name, using those accounts to pay his personal creditors, and instructing his employers to pay his insurance premiums directly to the carriers); *Robertson*, 493 F.3d at 1327, 1331-32

11

(upholding U.S.S.G. § 2F1.1(b)(5)(C) enhancement where defendant in software-purchasing scam used false names and addresses and fictitious entities to obtain discounts and avoid payments); *United States v. Campbell*, 491 F.3d 1306, 1315 (11th Cir. 2007) (upholding § 2T1.1(b)(2) enhancement where defendant used campaign accounts and credit cards issued to other people in order to conceal cash expenditures in an attempt to impede the discovery of the existence and extent of his tax fraud).

For a period of about one year, Research Center employees prepared and signed forms in which they falsely purported to have treated certain patients with prescription drugs, and Mendez and CC1 submitted those claims to Medicare. Mendez and CC1 sometimes received advice from Napoles as to which treatments would garner higher payments. Caridad and Barbara recruited patients, and the patients, Caridad, Barbara, and Napoles each received kickbacks for their participation. Mendez was openly identified as an officer of Research Center, and either he or this then-wife was openly identified as an officer of the three shell companies—Research Center Phase I-IV, Olmen, and Efol—discussed by the district court. None of the three shell companies was involved in carrying out or concealing the fraudulent billing. These facts do not bear the hallmarks of sophistication that we have identified in previous cases.

12

Nevertheless, the three shell companies were used to manage a portion of the proceeds of the fraud, either as legitimate holding companies or as fictional money-laundering entities, and $500,000 of those proceeds were eventually transferred to an overseas account. The district court referred to this activity as "the execution and the concealment of the disposition of the funds," which it considered to be part of the overall scheme because "the fraud stops where the money ends." Mendez does not argue on appeal that the district court erred in considering these facts as part of its sophisticated-means analysis. *See United States v. Cunningham*, 161 F.3d 1343, 1344 (11th Cir. 1998) (holding that issues not raised on appeal are abandoned). Therefore, the language in Application Note 8 that addresses the use of "corporate shells or offshore financial accounts" in the scheme is satisfied. Although the applicability of the enhancement is a very close question, we are not "left with [a] definite and firm conviction" that the district court erred in applying the sophisticated-means enhancement.[1] *See Robertson*, 493 F.3d at 1329-30.

III.

---

[1] Mendez does not argue on appeal that the district court erroneously conflated the sophisticated-means analysis and the aggravating-role analysis. For this reason, and because we uphold the enhancement on the basis of the shell-company transactions, we do not address whether the district court's reasoning in this regard constituted impermissible double-counting. *See Cunningham*, 161 F.3d at 1344.

13

We review a sentence for reasonableness in a two-step process. First, we must ensure that the district court did not commit any significant procedural error, such as failing to consider the 18 U.S.C. § 3553(a) factors or failing to explain the sentence adequately. *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007). Here, Mendez objected to the application of the sophisticated-means enhancement, but he did not object that the district court had failed to consider the § 3553(a) factors. Therefore, to the extent that Mendez intends to raise a procedural challenge to the court's consideration of the sentencing factors, we review for plain error. *See United States v. Massey*, 443 F.3d 814, 818 (11th Cir. 2006). Under this standard, Mendez must show (1) an error that (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).

Second, we review the substantive reasonableness of the sentence under an abuse-of-discretion standard. *United States v. Irey*, 612 F.3d 1160, 1188 (11th Cir. 2010) (*en banc*), *petition for cert. filed*, (Nov. 24, 2010) (No. 10-727). We will reverse a sentence under this standard only if the district court has made a clear error of judgment. *Id.* at 1189. The appellant bears the burden of

14

establishing that the sentence is unreasonable. *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005).

After *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), sentencing is a two-step process that requires the district court first to "consult the Guidelines and correctly calculate the range provided by the Guidelines," then to consider the factors in 18 U.S.C. § 3553(a) and determine a reasonable sentence. *Talley*, 431 F.3d at 786. Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with training or medical care; (6) the kinds of sentences available; (7) the sentencing guideline range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to the victims. *Id.* (discussing § 3553(a)).

The sentence must be sufficient, but no greater than necessary, to punish, deter, protect the public, and provide the training and care outlined in the statute. § 3553(a). In *Irey*, 612 F.3d at 1196-97, we rejected the term "parsimony principle" to describe this requirement, noting its tendency "to slant the discussion

15

toward shorter sentences" and pointing out that "[t]he requirement is not merely that a sentencing court . . . be stingy enough to avoid one that is too long, but also that it be generous enough to avoid one that is too short."

Here, Mendez submitted a sentencing memorandum to the district court that discussed his background and his remorsefulness. After resolution of the sophisticated-means objections, both parties argued that a sentence at the low end of the guideline range would be reasonable. The court stated that it had considered the parties' statements, the presentencing investigation report, the advisory guideline range, and the statutory sentencing factors. It then imposed the low-end guideline sentence requested by the parties. Mendez did not request clarification as to the court's weighing of the § 3553(a) factors. Therefore, to the extent that Mendez intends to raise a procedural challenge, he has not shown that the court committed plain error. *See Massey*, 443 F.3d at 818.

To the extent that Mendez challenges the weighing of the § 3553(a) factors, most of his argument focuses on the district court's decision to apply the sophisticated-means enhancement and the fact that not all of the related defendants received the same enhancement. This argument is inapposite to a discussion of substantive reasonableness. *See Talley*, 431 F.3d at 786 (noting that correct calculation of the guideline range and consideration of the § 3553(a) factors are

16

separate steps in the sentencing process). Mendez's contention that the "parsimony principle" constitutes a cap on the permissible length of a sentence is incorrect. *See Irey*, 612 F.3d at 1197. Otherwise, Mendez merely makes the conclusory assertion that the district court did not adequately consider his background, his lack of a criminal history, the improbability that he will reoffend, "the circumstances underlying and precipitating the offense," or "the facts of this individual case." He does not explain why a 78-month sentence, at the low end of his guideline range, is excessive in light of these factors, or which relevant facts and circumstances he believes to have been overlooked. Mendez has not shown that the district court committed a clear error of judgment in its assessment of the § 3553(a) factors. *See id.* at 1189. The 78-month sentence was not an abuse of the court's discretion. *See id.* at 1188.

For the foregoing reasons, we affirm Mendez's sentence.

**AFFIRMED.**

17