[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11943

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ANTOINE FITZGERALD SMITH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 1:22-cr-00036-AW-MAL-1

_____

Before GRANT, BRASHER, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Defendant appeals the 90-month sentence he received after pleading guilty to being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Defendant argues that (1) the district court procedurally erred when it calculated his base offense level pursuant to USSG § 2K2.1(a)(4)(B), a guideline that applies when the firearm involved in a § 922(g) offense is a semiautomatic weapon capable of accepting a large capacity magazine, and (2) the 90-month sentence imposed by the court is substantively unreasonable. After careful review, we reject Defendant's arguments and **AFFIRM** his sentence.

## BACKGROUND

Defendant was indicted in December 2022 on one count of possessing a firearm and ammunition after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). He subsequently pled guilty to possessing a Smith & Wesson semiautomatic pistol capable of accepting a 25-round detachable "box-style" magazine of .22 caliber ammunition and three magazines containing a total of 70 rounds of .22 caliber ammunition.

As described in the presentence investigation report ("PSR"), Defendant's offense conduct involved three separate incidents that occurred between April and September 2022. On April 22, 2022, Gainesville, Florida police officers were dispatched to a laundromat after a 911 caller reported that an individual in a white

BMW SUV was waving and pointing a gun at people in traffic. The officers located the described vehicle in a parking lot and conducted a traffic stop during which they questioned Defendant, the sole occupant of the vehicle. After smelling marijuana in the vehicle and noticing a white powdery substance and what appeared to be the stock of a rifle in plain view, the officers conducted a probable cause search during which they found a Smith & Wesson semiautomatic pistol loaded with one detachable "box-style" magazine and two additional loaded magazines containing a total of 70 rounds of .22 caliber ammunition. Upon being questioned by the officers, Defendant denied the vehicle or firearm were his and falsely identified himself with his brother's name, "Marquis Smith." Defendant was briefly detained, but released on his own recognizance on April 25, 2022.

The next incident occurred on August 11, 2022. At approximately 9:30 p.m. that evening, a Gainesville police officer stopped a white BMW SUV that failed to stop at a stop sign. After identifying the driver as Defendant, the officer asked if there were any weapons in the vehicle and Defendant responded in the affirmative. While questioning Defendant, the officer observed a rifle in the back passenger seat, later determined to be a Mossberg .22 long rifle. Further investigation revealed that Defendant had recently been arrested for possessing a firearm as a convicted felon and an NCIC check showed that Defendant had three prior felony convictions in Virginia. Nevertheless, the officer released Defendant with a warning after Defendant provided a letter purportedly signed by

the Governor of Virginia reinstating his right to vote and carry firearms.

The last incident occurred on September 2, 2022, when a Miami Springs police officer observed a white BMW SUV with the driver's side door open and open containers of alcohol in plain view inside. The officer determined from a record check that the vehicle was registered to Defendant, who was in the driver's seat at the time, and that Defendant had a possible FBI warrant for possession of a firearm and ammunition by a convicted felon. Further investigation revealed Defendant's prior Virginia felony convictions. When the officer questioned the passenger in the vehicle, Defendant's wife Eva Smith, she advised him that there was a firearm in the glove box that belonged to Defendant, and that he had purchased it recently. Asked about the firearm, Defendant stated, "I have my paperwork," suggesting that he had a permit for the gun and/or that his right to carry a firearm had been restored. Defendant subsequently was placed under arrest, after which the officer recovered a Berretta 22 LR handgun in the glove box that was loaded with fifteen rounds of ammunition. This gun was later determined to have been stolen.

Meanwhile, an FBI investigation in August 2022, revealed that the document Defendant had presented to the police purportedly restoring his right to possess a firearm was not issued by the Virginia courts, as Defendant had represented. Further, and in connection with the investigation, an FBI task force officer provided information about Defendant's recent activities at a firing range.

Specifically, the officer reported that he had contacted an individual who witnessed Defendant arrive at the firing range in a white SUV, carrying a case that looked like it held a semiautomatic long rifle, a small pistol, and another weapon. Another individual who was at the firing range relayed a photograph shared by Defendant of an AR-15 style rifle, the small pistol, and boxes of ammunition, and advised that he had sold Defendant a Mossberg 22 long rifle—the gun found in Defendant's vehicle on August 11, 2022—for $300. Investigators determined that Defendant was a convicted felon whose rights had not been restored when he was in possession of the firearms described by the individual at the firing range and when he was found to be in possession of firearms during the April, August, and September 2022 traffic stops.

The PSR assigned Defendant a base offense level of 20 pursuant to USSG § 2K2.1(a)(4)(B) because the Smith & Wesson pistol involved in the offense was a semiautomatic firearm capable of accepting a large capacity magazine. The offense level was increased by two levels pursuant to USSG § 2K2.1(b)(1)(A) because it involved three to seven firearms, and it was increased by two additional level under § 2K2.1(b)(4)(A) because one of the firearms was stolen. Two levels were added under USSG § 3C1.1 for obstruction of justice based on the fraudulent document Defendant provided to police during the August traffic stop, resulting in an adjusted offense level of 26. After decreasing the offense level by three for Defendant's timely acceptance of responsibility, the PSR calculated his total offense level as 23.

In the criminal history section, the PSR described Defendant's multiple prior convictions, beginning when he was 19 years old and including convictions for larceny, assault and battery on a family member, brandishing a firearm and maliciously discharging a firearm at an occupied dwelling, and a prior state conviction for possession of a firearm by a convicted felon, among other things. Based on his prior convictions, Defendant's criminal history category was determined to be III.[1] With a criminal history category of III and a total offense level of 23, Defendant's recommended guidelines range was calculated to be 57 to 71 months. The PSR noted that the statutory maximum term for Defendant's offense was ten years.

As relevant here, Defendant objected to being sentenced under USSG § 2K2.1(a)(4)(B), arguing that the Smith & Wesson pistol he possessed is excluded from the definition of a semiautomatic firearm capable of accepting a large capacity magazine pursuant to Application Note 2 of § 2K2.1.[2] Application Note 2 states that a "semiautomatic firearm that is capable of accepting a large capacity magazine" does not include "a semiautomatic firearm with an

---

[1] In addition to these convictions, the PSR described several more arrests that did not contribute to Defendant's criminal history score because they were dismissed, including one incident during which Defendant allegedly choked a female victim during an argument and stabbed the victim's sister when she tried to intervene.

[2] Defendant also initially objected to the enhancement applied because the offense involved three to seven firearms and the obstruction of justice adjustment, but he withdrew those objections at sentencing.

attached tubular device capable of operating only with .22 caliber rim fire ammunition." USSG § 2K2.1, comment. (n.2). According to Defendant, the Smith & Wesson qualifies for the exception set out in Application Note 2 because it has an "attached tubular barrel" and it uses only .22 caliber rim fire ammunition. If the court sustained his objection, Defendant noted, his base offense level would be 12 rather than 20.

Defendant reasserted the above objection at sentencing. During argument on the objection, Defendant acknowledged that the Smith & Wesson is a "semiautomatic firearm capable of accepting a large-capacity magazine" and that the only "attached tubular device" the firearm contains is its "tubular" barrel, a feature of any firearm. Nevertheless, he argued the exception set out in Application Note 2 applied to the Smith & Wesson because of its "tubular" barrel and because the exception was intended to exclude a modernized version of a .22 caliber hunting rifle that shoots low-caliber ammunition, such as the Smith & Wesson. Defendant did not offer any authority to support the latter point.

In response to Defendant's argument, the Government called John Bodnar, an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), to testify. After examining photographs of the Smith & Wesson and the magazines recovered with it, Bodnar testified that it is a semiautomatic assault rifle ("AR") style pistol capable of accepting detachable large capacity box-style magazines, each of which can hold twenty-five rounds of .22 caliber ammunition. Bodnar explained that such firearms can be

reloaded quickly by releasing an empty magazine and attaching a new, fully loaded magazine. This feature, Bodnar opined, distinguished the Smith & Wesson from .22 caliber firearms that do not accept detachable magazines but instead utilize a tubular ammunition-feeding device that is attached to and runs underneath the barrel of the firearm.[3] Reloading such a tubular-style firearm is a much slower process than reloading a firearm that accepts a box-style magazine because it requires hand-loading loose ammunition one round at a time. Bodnar clarified in his testimony that firearms either have an attached tubular ammunition feeding device or they accept detachable box-style feeding magazines—one or the other, but not both—and that the Smith & Wesson at issue in this case is in the latter category. As such, Bodnar concluded, the Smith & Wesson does not have an "attached tubular device" and thus does not fall within the exception to § 2K2.1(a)(4)(B) set out in Application Note 2.

Based on Bodnar's testimony, the district court agreed with the Government that the Smith & Wesson used in Defendant's offense does not qualify for the exception described in Application Note 2 because it does not have an "attached tubular device." The court specifically rejected Defendant's argument that the barrel of the firearm is an "attached tubular device," explaining that was an unreasonable interpretation given that every firearm has a barrel that can be described as "tubular." Consistent with Bodnar's

---

[3] Bodnar explained that the tubular-style weapon is like what you would see in an old Western repeater style rifle.

testimony, the court interpreted the term "attached tubular device" to refer to a tubular ammunition feeding device that is attached to the firearm, not simply the barrel of the firearm. Accordingly, the court concluded that Defendant should be sentenced under USSG § 2K2.1(a)(4)(B) because the Smith & Wesson he possessed is a "semiautomatic firearm that is capable of accepting a large-capacity magazine."

At the conclusion of the sentencing hearing, Defendant asked for a sentence in the low guidelines range of 57 months, noting that most of his criminal history occurred at a young age and that he had recently maintained "good employment" as a truck driver. The Government acknowledged that Defendant had stayed out of trouble for some time since his release from prison in 2015, but emphasized that he had been found to be illegally armed three times between April and September 2022, in response to which he took steps to avoid responsibility for his conduct by using a fake name, fabricating documents, and falsely representing he had "paperwork" that allowed him to carry firearms. The Government highlighted further Defendant's violent history, including his conviction for assault on a family member in 2005 after allegedly striking his child's mother, pointing a pistol at her face, and threatening to kill her, and his separate conviction in 2005 for maliciously discharging a firearm at an occupied building after firing a shotgun round through his girlfriend's window. Given Defendant's pattern of violent criminal activity, the Government asked for a "substantial sentence."

After considering the arguments of both parties, the district court noted that the PSR correctly calculated Defendant's advisory guidelines range as 57 to 71 months. Nevertheless, the court determined that an upward variance was warranted given Defendant's criminal history and the circumstances of his offense. In support of the variance, the court observed that "a very dangerous set of facts" had preceded Defendant's indictment in this case, including a pattern of criminal activity involving multiple firearms between April and September 2022 and an incident during which Defendant had not just unlawfully possessed a firearm but waived it around in traffic in a situation where other people would have been frightened and might have responded with their own firearms. The court explained that Defendant's criminal history was also a "big factor" in its decision to vary upward, particularly the incidents involving Defendant firing a shotgun through his girlfriend's window and pointing a gun at his child's mother and threatening to kill her. Another factor the court relied on was Defendant's attempt to avoid responsibility for his conduct by using a false name and fabricating documents. Finally, the court noted that Defendant had not been deterred by his prior prison sentence or by the two encounters with police that preceded his arrest in September 2022, all for similar conduct involving his unlawful possession of firearms.

Ultimately, the district court sentenced Defendant to 90 months in prison, to be followed by three years of supervised release. The court expressly stated that it had considered all the § 3553(a) sentencing factors in determining the sentence, and concluded that a 90-month sentence was "sufficient but not greater

than necessary to comply with the statutorily defined purposes of sentencing" in Defendant's case. Addressing Defendant's objection to being sentenced under USSG § 2K2.1(a)(4)(B), the court stated that it "would have imposed the same sentence" even if the objection had been sustained because Defendant's criminal history and his offence conduct indicated that he was dangerous.

Defendant appeals his sentence, arguing that the district court procedurally erred when it applied the base offense level available under USSG § 2K2.1(a)(4)(B) and ultimately imposed a substantively unreasonable sentence. As discussed below, we find no procedural error, and we conclude that Defendant's sentence is substantively reasonable.

## DISCUSSION

### I. Standard of Review

We use a two-step process to review the reasonableness of a sentence imposed by the district court. *See United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014). First, we determine whether the district court "committed any significant procedural error, such as miscalculating the advisory guidelines range, treating the guidelines as mandatory, failing to consider the [§ 3553(a)] factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* If not, then "we examine

whether the sentence is substantively unreasonable under the to-tality of the circumstances and in light of the § 3553(a) factors."[4]  *Id.*

At the procedural error stage of the analysis, we review *de novo* any purely legal questions regarding the guidelines.  *See id.*  On the other hand, we review for clear error the district court's factual findings.  *See id.*  Clear error review "is deferential."  *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) (quotation marks omitted).  It requires us to leave the district court's findings undisturbed unless we are "left with a definite and firm conviction that a mistake has been committed."  *Id.* (citation and quotation marks omitted).

We review the substantive reasonableness of a sentence under a similarly deferential abuse of discretion standard.  *United States v. Fox*, 926 F.3d 1275, 1278 (11th Cir. 2019).  When applying the abuse of discretion standard, we will affirm unless the district court "has made a clear error of judgment, or has applied the wrong legal standard."  *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004).  *See also United States v. Kuhlman*, 711 F.3d 1321,

---

[4] The § 3553(a) factors include:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (3) the need for deterrence, (4) the need to protect the public, (5) the need to provide the defendant with needed education or vocational training or medical care, (6) the kinds of sentences available, (7) the sentencing guidelines range, (8) pertinent policy statements of the sentencing commission, (9) the need to avoid unwarranted sentencing disparities, and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

1326 (11th Cir. 2013) (explaining that the abuse of discretion standard "allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment" (quotation marks omitted)).

## II.    **Procedural and Substantive Reasonableness**

### A.    Procedural Reasonableness

As noted, Defendant argues on appeal that the district court committed procedural error when it determined he was subject to a base offense level of 20, the offense level applicable under USSG § 2K2.1(a)(4)(B) when the weapon at issue in a § 922(g) offense is a "semiautomatic firearm that is capable of accepting a large capacity magazine." *See* USSG § 2K2.1(a)(4)(B)(i).  Defendant concedes that the Smith & Wesson he pled guilty to possessing is a semiautomatic firearm capable of accepting a large capacity magazine.  Nevertheless, he argues the gun falls within an exception provided in Application Note 2, which provides that the base offense level set out in § 2K2.1(a)(4)(B) does not apply to a "semiautomatic firearm with an attached tubular device capable of operating only with .22 caliber rim fire ammunition." *See* USSG § 2K2.1, comment. (n.2). Admittedly, there is no "tubular device" attached to the Smith & Wesson that is separable from the barrel of the gun.  But according to Defendant, the Smith & Wesson shoots only .22 caliber ammunition and its "tubular-shaped" barrel constitutes an attached tubular device, thus qualifying the gun for the exception in Application Note 2.

We reject Defendant's argument.  As an initial matter, the plain language of USSG § 2K2.1(a)(4)(B) unambiguously assigns a base offense level of 20 when a firearm offense involves a "semiautomatic firearm that is capable of accepting a large capacity magazine."  *See* USSG § 2K2.1(a)(4)(B).  Defendant admitted below, and he concedes on appeal, that the Smith & Wesson he pled guilty to possessing meets this definition.  Pursuant to this Court's recent decision in *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023), Defendant's concession arguably concludes our analysis.  *See Dupree*, 57 F.4th at 1279 (concluding there was "no need to consider, much less defer to, the commentary" in Application Note 1 to USSG § 4B1.2(b) where the text of that guideline was unambiguous).

To the extent Application Note 2 is relevant, we agree with the district court that Defendant's argument relies on an unreasonable interpretation of the application note, the plain language of which applies only to a firearm "with an attached tubular device."  *See* USSG § 2K2.1, comment. (n.2).  The phrase "attached tubular device" most naturally refers to a tubular <u>attachment</u> to a firearm, such as the tubular ammunition feeding device attached to the Western-style repeater rifle described by Bodnar at sentencing.  *See United States v. Chinchilla*, 987 F.3d 1303, 1313 (11th Cir. 2021) ("[T]he fundamental precept of statutory interpretation is that the language must be given its plain and ordinary meaning unless the statutory text or context requires otherwise.").  It would be a stretch to read the phrase "attached tubular device" to refer to the

barrel of a firearm, which may be tubular in shape, but which is an integral part of the firearm rather than an attachment to it.

Defendant's interpretation also conflicts with the scheme of USSG § 2K2.1 and the language surrounding the "attached tubular device" phrase in Application Note 2. Section 2K2.1 provides for base offense levels between 6 and 26 for federal firearms offenses. *See* USSG § 2K2.1(a). Within that range, the specific offense level that applies in a particular case varies depending on the perceived threat presented by the defendant as assessed by his criminal history and by the dangerousness of the firearm at issue, including, as relevant here, whether the firearm is a "semiautomatic" weapon "that is capable of accepting a large capacity magazine." *See* USSG § 2K2.1(a). The language immediately preceding the "attached tubular device" exception in Application Note 2 makes clear that the reason for the higher base offense level in the case of a semiautomatic weapon capable of accepting a large capacity magazine is the danger raised by the ability "to fire many rounds without reloading" such a weapon because of readily attachable magazines that can accept "more than 15 rounds of ammunition." *See* USSG § 2K2.1, comment. (n.2).

In other words, it is the quick reloading feature of a semiautomatic firearm capable of accepting a large capacity magazine that makes the firearm relatively more dangerous than other types of firearms and that warrants the higher base offense level. As Bodnar explained at sentencing, the Smith & Wesson Defendant possessed is the type of weapon that has this feature, as distinguished from a

semiautomatic firearm with an attached tubular ammunition feeding device that takes much longer to reload. Thus, construing "attached tubular device" to refer to the tubular-shaped barrel of such a gun despite its quick reloading capacity would frustrate the overall purpose of USSG § 2K2.1.

In short, the district court correctly held that Defendant's base offense level for his § 922(g) offense is 20 pursuant to USSG § 2K2.1(a)(4)(B) because the Smith & Wesson he pled guilty to possessing is a "semiautomatic firearm that is capable of accepting a large capacity magazine." *See* USSG § 2K2.1(a)(4)(B). Defendant does not argue that the court committed any additional procedural error, and we have found no such error in our review of the record.

### B.    Substantive Reasonableness

Although we conclude that the district court did not err when it determined Defendant's base offense level to be 20 under USSG § 2K2.1(a)(4)(B), we note that any such error would have been harmless. As discussed, the court explained at sentencing that it would have imposed a 90-month sentence in Defendant's case regardless of how it resolved the guidelines dispute about his base offense level. Thus, even assuming the court erred in that regard, Defendant's sentence is due to be affirmed unless he can show that it would have been substantively unreasonable under the lower guidelines range that would apply if his objection to the application of § 2K2.1(a)(4)(B) had been sustained. *See United States v. Keene*, 470 F.3d 1347, 1349–50 (11th Cir. 2006) (noting that the court need not resolve a guidelines dispute if the trial court makes clear it

made no difference to the ultimate sentence imposed and the sentence is substantively reasonable under the lower guidelines range advocated by the defendant). Defendant has not made the required showing here.

If the district court had sustained Defendant's objection regarding the semiautomatic high-capacity magazine issue, his base offense level would have been 12 instead of 20, his total offense level would have been 15 rather than 23, and his advisory guidelines range would have been 24 to 30 months in prison. *See* USSG § 2K2.1(a)(7). The 90-month sentence imposed by the court would represent a significant upward variance from such an advisory range, but that does not make it substantively unreasonable. *See United States v. Oudomsine*, 57 F.4th 1262, 1267 (11th Cir. 2023) ("We may take the degree of variance into account, but we do not presume that a sentence outside the guidelines range is unreasonable and we must give due deference to the district court's decision that the § 3553(a) factors support its chosen sentence."). Even when there is a significant variance, this Court will not reverse a sentence as substantively unreasonable unless it is left with a "definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors" and arrived at a sentence that is "outside the range of reasonable sentences dictated by the facts of the case." *United States v. Johnson*, 803 F.3d 610, 618–19 (11th Cir. 2015) (quotation marks omitted). That is not the case here.

First, there is no indication in the record that the district court committed any error in weighing the § 3553(a) factors. Such an error may occur if the court fails to consider relevant factors, gives significant weight to an improper or irrelevant factor, or commits a clear error of judgment in weighing the factors. *See United States v. Irey*, 612 F.3d 1160, 1189–90 (11th Cir. 2010). Here, the district court expressly considered all the relevant § 3553(a) factors. Explaining its upward variance to 90 months, the court honed in on Defendant's: (1) conduct that resulted in the April 2022 traffic stop, including not just unlawfully possessing a firearm but recklessly waiving it around in traffic, (2) efforts to avoid responsibility for his conduct by giving a false name to police and fabricating documents, (3) criminal history, including convictions relating to his use of firearms to assault and threaten the mother of his child and a former girlfriend, and (4) recalcitrance and utter resistance to deterrence, as evidenced by his continued acquisition and possession of firearms after serving an earlier state sentence for unlawful possession of a firearm and after being detained and questioned about his unlawful possession of a firearm on two separate occasions before the third and final incident in September 2022. The court acted within its discretion when it emphasized these factors, and its analysis of these and other relevant facts in the case was thorough and reasonable.

Contrary to Defendant's argument, the court did not improperly consider the PSR's description of his offense conduct in this case and his conduct that resulted in prior convictions. There is nothing "inherently unreliable" about these descriptions, as

Defendant suggests. Regarding Defendant's conduct preceding the April 2022 traffic stop, a caller reported to the police that an individual was "waving and pointing a gun at people in traffic while driving a white BMW SUV." When the police arrived on the scene, they found Defendant in a vehicle that matched the description reported by the caller with a firearm in plain view, corroborating at least some of the facts stated by the 911 caller. As to Defendant's prior convictions, the PSR recounted facts set out in a state presentence investigation report and in a police report indicating that on one occasion in 2005 Defendant struck the mother of his child, pulled her hair, pointed a handgun at her face, and threatened to kill her, and on another occasion that same year, he fired a shotgun round into his girlfriend's window. Defendant does not provide any rationale for his argument that these descriptions of his prior offense conduct are unreliable, other than the fact they were gathered from a state presentence investigation report and a police report.

But more importantly, Defendant did not object at sentencing to any of the facts set out in the PSR that he now claims are unreliable. As Defendant ultimately concedes in his appellate brief, a district court may rely on uncontested statements in the PSR when determining the appropriate sentence for a defendant, because the defendant is deemed to have admitted any such statements that he did not object to "specifically and clearly." *United States v. Aguilar-Ibarra*, 740 F.3d 587, 592 (11th Cir. 2014). *See also United States v. Philidor*, 717 F.3d 883, 885 (11th Cir. 2013) ("The district court may rely on undisputed facts contained in the PSI in

determining a sentence.").[5] Thus, the court did not commit a clear error of judgment when it considered the facts surrounding Defendant's offense conduct here, and in previous cases, in sentencing Defendant.

Neither is Defendant's 90-month sentence "outside the range of reasonable sentences dictated by the facts of [this] case." *See Johnson*, 803 F.3d at 619 (quotation marks omitted). The sentence is well below the statutory maximum ten-year penalty for Defendant's offense, an indicator of reasonableness. *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008) (noting that the defendant's sentence was "well below the maximum ten-year sentence available" for his offense). And the factors set out above, extensively discussed by the district court at sentencing, justify the court's upward variance to 90 months. As this Court has repeatedly explained, the district court has "considerable discretion" to decide whether the §3553(a) factors justify a variance in a particular

---

[5] Despite this concession, Defendant cites *United States v. Rosales-Bruno*, 676 F.3d 1017 (11th Cir. 2012) for the contrary proposition that this Court "generally does not rely on arrest reports to support factual findings at sentencing." *Rosales-Bruno* did not hold that a district court cannot rely on undisputed facts in the PSR concerning a defendant's criminal history when those facts were gathered from a police report, as Defendant implies, but rather that police reports do not constitute permissible *Shepard* documents for purposes of applying the modified categorical approach in sentencing "because a defendant generally does not admit the conduct described in those documents." *Id.* at 1021 (quotation marks omitted). That holding is inapplicable to this case, where the facts at issue are undisputed—and thus admitted—and the modified categorical approach is not implicated.

case. *United States v. Pugh*, 515 F.3d 1179, 1190–91 (11th Cir. 2008) (noting the "institutional advantage that district courts have in applying and weighing the [§ 3553(a)] factors in individual cases"). Likewise, the "decision about how much weight to assign a particular sentencing factor is committed to the sound discretion of the district court." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (quotation marks). Accordingly, "it is only the rare sentence that will be substantively unreasonable." *United States v. Dixon*, 901 F.3d 1322, 1351 (11th Cir. 2018) (quotation marks and citation omitted). This is not one of those rare cases.

## CONCLUSION

For the foregoing reasons, Defendant's sentence is **AFFIRMED**.